UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/4/10
```

------------------------------X
                              :
In re M/V RICKMERS GENOA      :
LITIGATION                    :
                              :
------------------------------X
                              :
THIS DOCUMENT RELATES TO:     :
ALL ACTIONS                   :
                              :
------------------------------X

05 Civ. 4261(LAP)
  (Main Action)
05 Civ. 6226(LAP)
05 Civ. 8841(LAP)
05 Civ. 9472(LAP)


OPINION AND ORDER

LORETTA A. PRESKA, CHIEF UNITED STATES DISTRICT JUDGE:

   This Opinion and Order resolves a third-party action and
certain other claims arising out of a maritime disaster in the
Yellow Sea.  After two ships, the M/V RICKMERS GENOA (the
"RICKMERS GENOA") and the M/V SUN CROSS (the "SUN CROSS"),
collided, water flooded one of the RICKMERS GENOA's cargo holds.
That hold contained 600 tons of a granulated, magnesium-based
desulphurization reagent with the trade name Super-Sul Mg-89
("SS-89").  About four hours later, the RICKMERS GENOA suffered
an explosion and fire in that hold.  The chief officer died in
the explosion, and all of the cargo in that hold was destroyed.
The ship itself sustained serious damage.  The owners of the
destroyed cargo (the "Cargo Interests") instituted actions
against, inter alia, the vessel owner, Rickmers Linie GmbH &
Cie. KG ("Rickmers"), the SS-89 manufacturer ESM (Tianjin) Co.,
Ltd. ("ESMT"), the manufacturer's parent company ESM Group, Inc.
("ESM Group"), and the non-vessel-owning common carrier

("NVOCC") that shipped the SS-89 on board the RICKMERS GENOA,
Pudong Trans.  Rickmers then brought this third-party action
against ESMT and ESM Group (collectively, "Defendants").  ESMT
and ESM Group now move for summary judgment on all claims
against them.  [See dkt. no. 152 (4261 action).]  For the
reasons set forth below, Defendants' motion [id.] is GRANTED in
its entirety.


I.    BACKGROUND

     The general background of this action is set forth in this
Court's prior decision, In re M/V RICKMERS GENOA Litigation, 622
F. Supp. 2d 56 (S.D.N.Y. 2009), which is hereby incorporated by
reference.  The parties refer to the collision, together with
the subsequent explosion and fire aboard the RICKMERS GENOA, as
the "Casualty."  They refer to this particular voyage of the
RICKMERS GENOA as the "Casualty Voyage."  The following
additional facts are derived from the parties' Rule 56.1
statements, affidavits, deposition testimony, and exhibits.

     ESM Group is a Delaware limited liability corporation with
its principal place of business in New York.  Id. at 60.  ESMT
is a wholly owned subsidiary of ESM Group located in Tianjin,
People's Republic of China and organized under Chinese law.  Id.
ESMT produces a family of magnesium-based desulphurization
reagents, including SS-89.  Id.  SS-89, which is so named

2

because it contains 89% magnesium, is injected into molten iron
ore to remove sulphur and thereby strengthen the resulting
steel.  Id.  Because magnesium is flammable and potentially
explosive upon contact with water, SS-89 must be kept dry and
away from moisture.  Id.  Magnesium fires must be extinguished
with dry material such as graphite, sand, or Purple K, rather
than water or carbon dioxide.  (Dillon Aff., Ex. 23 at 1.)

In February 2005, ESMT sought to transport a 600-ton
shipment of SS-89 from its plant in Tianjin to ESM Group in the
United States.  (ESM 56.1 Stmt. ¶ 5; Rickmers 56.1 Stmt. ¶ 5.)[1]
It hired Pudong Trans to arrange for shipment of the SS-89 by
sea.  (See O'Connor Aff., Ex. 57 at 1.)  Pudong Trans issued its
own bill of lading to ESMT in which it agreed to accept the SS-
89 from ESMT and have it shipped to the United States on board
the RICKMERS GENOA.  (See id.)

Pudong Trans inquired with Rickmers about booking a
shipment of the SS-89 on the RICKMERS GENOA.  (See ESM 56.1
Stmt. ¶ 55; Rickmers 56.1 Stmt. ¶ 55.)  Pursuant to Rickmers'
standard booking-inquiry practices (see ESM 56.1 Stmt. ¶¶ 51-52;
Rickmers 56.1 Stmt. ¶¶ 51-52), Pudong Trans supplied Rickmers

---

[1] "ESM 56.1 Stmt." refers to the Amended Local Rule 56.1
Statement of ESM Group Inc. and ESM (Tianjin) Co., Ltd.  [Dkt.
no. 179 (4261 action).]  "Rickmers 56.1 Stmt." refers to
Rickmers' Amended Rule 56.1(b) Statement in Opposition to ESM
Group Inc.'s Motion for Summary Judgment.  [Dkt. no. 180 (4261
action).]

with the Harmonized Tariff System ("HTS") Commodity Code number
that corresponded to a description of certain physicochemical
properties of the SS-89.  (ESM 56.1 Stmt. ¶¶ 48, 55-56; Rickmers
56.1 Stmt. ¶¶ 48, 55-56.)  That number, 81043000, identified
"Magnesium and articles thereof including waste and scrap:
Raspings, turnings and granules, graded according to size;
powders."  (ESM 56.1 Stmt. ¶ 39; Rickmers 56.1 Stmt. ¶ 39.)
Paul Wang, an employee of Rickmers' commercial booking staff in
Tianjin, received Pudong Trans' inquiry.  (ESM 56.1 Stmt. ¶ 55;
Rickmers 56.1 Stmt. ¶ 55.)  He understood from the HTS Commodity
Code number that SS-89 was a magnesium-based cargo.  (ESM 56.1
Stmt. ¶ 55; Rickmers 56.1 Stmt. ¶ 55.)  Wang, however, did not
have authority to accept cargo on Rickmers' behalf; this was the
responsibility of one Joachim Neimke, another Rickmers'
employee.  (Dillon Aff., Ex. 1 ¶ 15.)

Wang's relevant responsibility was to enter Pudong Trans'
booking inquiry into Rickmers' computerized booking system (the
"Softship System") and forward that information to Neimke for
his review.  (ESM 56.1 Stmt. ¶¶ 29, 54-55; Rickmers 56.1 Stmt.
¶¶ 29, 54-55.)  Because of certain technical limitations on the
Softship System, however, Wang did not forward the number
81043000 to Neimke.  (ESM 56.1 Stmt. ¶¶ 52-53; Rickmers 56.1
Stmt. ¶¶ 52-53.)  Instead, he sent Neimke HTS Commodity Code
number 810419, which identifies "Other unwrought magnesium."

(ESM 56.1 Stmt. ¶ 53; Rickmers 56.1 Stmt. ¶ 53.)  This description was considerably more general than the one Pudong Trans had provided to Rickmers.  Changing the HTS Commodity Code number in this way had been Wang's customary practice when handling inquiries to book shipments of SS-89.  (ESM 56.1 Stmt. ¶ 54; Rickmers 56.1 Stmt. ¶ 54.)

The HTS Commodity Code number constitutes information that Neimke could have used to make his decisions whether to accept and how to stow the cargo of SS-89.  (Dillon Aff., Ex. 1 ¶ 61; Neimke Dep. 102:5-18.)  Although nothing prevented Neimke from using this information for these purposes (Dillon Aff., Ex. 1 ¶ 61)——except perhaps his own "lack of knowledge of this possibility" at the time he accepted the SS-89 (Neimke Dep. 103:12-19)——Neimke nevertheless did not use the information to decide whether to accept and how to stow the SS-89 (id. at 102:5-11).  Thus, without having assessed all the information Pudong Trans provided to Rickmers, Neimke accepted the SS-89 cargo on Rickmers' behalf for shipment on the Casualty Voyage. (See id. at 102:5-11; O'Connor Aff., Ex. 58 at 1.)  Rickmers issued its own bill of lading to Pudong Trans (see O'Connor Aff., Ex. 58); it identifies Pudong Trans as the shipper and does not mention ESMT (see id. at 1).

Two letters of indemnity that were in Rickmers' possession play a significant role in the parties' dispute.  The first

letter, dated November 8, 2004, covers a shipment of 600 bags of SS-89 that were shipped on the RICKMERS NEW ORLEANS approximately five months before the Casualty Voyage.  (O'Connor Aff., Ex. 55 at 1.)  It states:

> We herewith to certify that Super-Sul Mg-89 is not dangerous cargo listed in <<International Maritime Dangerous Goods Code>>, the cargo covering sub B/L(S) to be shipped in container is 600bags identical with the description as attached and are seaworthy packed.

> Carrier will claim for any damages consequence.  In the case that such claims are lodged, we irrevocably and without reservation authorize the forementioned to arrange all necessary steps at our account.

(Id. (errors in original and capitalization removed).)

The second letter is the subject of some dispute.  The printed material is identical in every respect to that in the first letter.  (See id., Ex. 56 at RG12020.)  The two rubber-stamped seals of ESMT, placed on the signature lines, are also identical in every respect to those in the first letter—including the way in which one of the two marks has been blurred.  (See id.)  Certain of the words printed in the first letter, however, have been replaced with handwritten words in the second letter.  The ship name NEW ORLEANS has been replaced with the handwritten word GENOA.  (See id.)  Likewise, the voyage number, bill of lading number, and date have all been replaced with handwritten terms corresponding to the Casualty Voyage.  (See id.)  The date, in particular, is February 22,

2005. (See id.) Additionally, one line printed in the first letter does not appear in the second letter. (See id.) On the basis of these changes and certain deposition testimony, ESMT contends that the letter is a forgery produced by Rickmers in response to the Casualty. Rickmers asserts that the letter is authentic.

In any event, Rickmers alleges in its Complaint that Neimke relied on the February 22, 2005 letter of indemnity when he agreed to book the SS-89 on the Casualty Voyage. (Compl. ¶¶ 40, 45.) Neimke testified, however, that he relied on the November 2004 letter of indemnity when he booked the SS-89 on the Casualty Voyage (Neimke Dep. 111:21–24) despite the letter's terms indicating that it covered a different voyage (O'Connor Aff., Ex. 55 at 1). Neimke admitted that he did not rely on the February 2005 letter. (ESM 56.1 Stmt. ¶ 149; Rickmers 56.1 Stmt. ¶ 149.)

Subsequently, the SS-89 was loaded into a cargo hold on board the RICKMERS GENOA. Rickmers Genoa, 622 F. Supp. 2d at 62. On March 8, 2005, the ship collided with the SUN CROSS in foggy weather in the Yellow Sea. Id. The RICKMERS GENOA suffered damage to her hull, and the cargo hold carrying the SS-89 flooded. Id. About four hours later, an explosion and fire occurred in that hold, causing extensive damage to both the ship

7

and its cargo and killing the RICKMERS GENOA's chief officer. Id.; (Rickmers Mem. Opp'n 9 n.5).

The RICKMERS GENOA's master, Captain Andrzej Bielawski, was not aware until the fire broke out that the SS-89 was "some kind of a mixture with magnesium." (Bielawski Dep. 377:12-24.)  The record does not indicate why, despite Neimke's acceptance of the SS-89 cargo as "Other unwrought magnesium" (ESM 56.1 Stmt. ¶ 53; Rickmers 56.1 Stmt. ¶ 53), Captain Bielawski was not apprised of the chemical nature of the SS-89 before the Casualty Voyage. Bielawski testified that he knew from his experience prior to the Casualty Voyage (Bielawski Dep. 379:8-13) that "magnesium, plus seawater, that means hydrogen."  (Id. at 378:9.)


II.  SUBJECT MATTER JURISDICTION

Here, the alleged cargo losses occurred aboard the RICKMERS GENOA while it was serving as a common carrier of goods on the high seas.  The damages occurred on navigable waters and arise from traditional maritime activity.  Accordingly, the Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1333(1).  See Rickmers Genoa, 622 F. Supp. 2d at 63 (setting forth the same analysis).

III. DISCUSSION

    A.   Legal Standard for Summary Judgment

    As this is a motion for summary judgment, Defendants will prevail only "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.' A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" Overton v. New York State Div. of Military and Naval Affairs, 373 F.3d 83, 89 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In assessing whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to the non-moving party. Lucente v. IBM Corp., 310 F.3d 243, 253 (2d Cir. 2002).

B.   Application to Defendants' Motion[2]

Defendants move for summary judgment on all claims against them.  Those claims include, inter alia, strict liability (Compl. ¶¶ 13-18),[3] negligent failure to warn (id. ¶¶ 19-27), breach of contract (id. ¶¶ 28-32), and detrimental reliance on a letter of indemnity (id. ¶¶ 39-46).[4]  As discussed below, Defendants are entitled to judgment on each of those claims as a matter of law.

---

[2] Rickmers' counsel, Eugene F. O'Connor, proffers his own 33-page Affidavit [dkt. no. 166 (4261 action)] purporting to set forth facts and legal arguments.  This Affidavit constitutes neither admissible evidence, see, e.g., Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 310 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(e) and explaining that affidavits in opposition to summary judgment "shall be made on personal knowledge . . . and shall show affirmatively that the affiant is competent to testify to the matters stated therein"), nor an acceptable substitute for a proper Local Rule 56.1 statement. Accordingly, the Court does not consider the substance of the Affidavit but considers only the exhibits attached thereto.

[3] "Compl." refers to the Second Amended Third-party Complaint (the "Complaint") [dkt. no. 133 (4261 action)].

[4] The Complaint also asserts a cause of action for "Breach of Warranty/Negligent Misrepresentation."  Rickmers' extensive original briefing, however, does not identify a distinction between this claim and the claims based on negligent failure to warn, breach of contract, and detrimental reliance on a letter of indemnity.  Indeed, this claim appears to be merely a restatement of those claims, and Rickmers' original briefing sets forth no independent legal standard supporting this claim. Accordingly, the Court construes it not as an independent cause of action but as merely a restatement of a claim discussed herein.  To the extent it does in fact constitute an independent claim, the claim is dismissed on the merits.  See infra part III.B.5 and n.11.  Alternatively, the Court deems the claim abandoned based on Rickmers' failure in its original briefing to set forth any argument in support of it.

1.   Strict Liability

The Carriage of Goods by Sea Act ("COGSA") provides, with respect to

> [g]oods of an inflammable, explosive, or dangerous nature to the shipment, whereof the carrier, master or agent of the carrier, has not consented with knowledge of their nature and character, [that] the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment.

46 U.S.C. § 30701 note § 4(6) (2006).  In other words, the shipper's potential exposure to strict liability under § 4(6) turns on the carrier's knowledge regarding the nature of the cargo it accepts from the shipper: "[A] carrier cannot invoke strict liability if it knows that a cargo poses a danger and requires gingerly handling or stowage, and nevertheless exposes the cargo to the general condition that triggers the known dangers, regardless of whether the carrier is aware of the precise characteristics of the cargo."  Contship Containerlines, Ltd. v. PPG Indus., Inc., 442 F.3d 74, 77 (2d Cir. 2006).[5]  The

---

[5] The Court of Appeals stated in In re M/V DG Harmony, 533 F.3d 83 (2d Cir. 2008) ("Harmony V"), that "if either [the shipper or the carrier] knows that 'such a reaction is possible,' liability is determined by reference to negligence principles rather than strict liability."  Id. at 93 (emphasis added) (quoting Contship Containerlines, Ltd. v. PPG Indus., Inc., 442 F.3d 74, 77 (2d Cir. 2006)).  This rule implies, contrary to the holding of Contship, that the shipper's knowledge of cargo's dangerousness could defeat the carrier's ability to invoke strict liability. Because the Harmony V court appeared to be explaining Contship

(continued on next page)

question of the carrier's knowledge is "binary": "'[A] party either will know that such a reaction is possible or it will not; the calibrated likelihood of a[ dangerous] reaction under a variety of [conditions] is not considered.'"  In re M/V DG Harmony, 533 F.3d 83, 93 (2d Cir. 2008) (hereinafter "Harmony V")[6] (quoting Contship, 442 F.3d at 77).

The Harmony V court's analysis demonstrates how courts should apply the "binary" inquiry.  In that case, the carrier knowingly agreed to carry a cargo of calcium hypochlorite ("calhypo").  Id. at 86.  Calhypo is a flammable, unstable substance, the dangerous propensities of which, together with required safety provisions, are described in the International Maritime Dangerous Goods Code (the "IMDG Code").  Id. at 87.

The carrier had certain information available to it regarding the properties of calhypo.  The IMDG Code warned that calhypo must be kept cooler than 55°C, id. at 89, and a material safety data sheet ("MSDS") supplied by the shipper warned that calhypo must be stored "away from heat" and kept under 117°C, id. at 90-91.  Unbeknownst to the carrier, however, the shipper

---

(continued from previous page)
rather than overruling it, however, this Court assumes that the holding of Contship stands notwithstanding the language of DG Harmony.

[6] The Court herein adopts the numbering system set forth in Judge Chin's most recent installment in the In re M/V DG Harmony saga. See In re M/V DG Harmony, No. 98 Civ. 8394(DC), 2009 WL 3170301, at *1 and n.1 (S.D.N.Y. Sept. 2009).

had packaged the cargo in such a way that it was substantially more dangerous than either of these warnings suggested.  Id. at 88.  Though the carrier was on notice of these two warnings, id. at 95 ("PPG's attestations and the IMDG Code shaped the carrier's reasonable expectations about the dangers of calhypo."), the carrier had no knowledge of the heightened level of danger arising from the shipper's packaging method, id. at 96 (quoting the district court's finding that the calhypo as packaged was "less stable than anyone realized").  The carrier then stowed the cargo on top of a heat source in violation of the warnings it had received.  Id. at 88.  During the voyage, the cargo caught fire and exploded, totally destroying the vessel.  Id. at 87.

The Harmony V carrier brought a civil action against the shipper, invoking theories of both strict liability and negligent failure to warn.  See In re M/V DG Harmony, 394 F. Supp. 2d 649 (S.D.N.Y. 2005), rev'd on other grounds, 533 F.3d 83 (2d Cir. 2008) (hereinafter "Harmony I"). Addressing the "binary" inquiry with respect to strict liability, the Harmony V court explained that the carrier "knew that calhypo was an unstable substance that became vulnerable to combustion when heated.  Despite this knowledge, the [carrier] exposed the calhypo to the general condition—heat—that induces such combustion.  As a result, although [it] may prevail on a

13

negligence theory, the [carrier] cannot prevail on strict liability." Harmony V, 533 F.3d at 93 (internal quotation marks omitted). Likewise, the Contship court, which was confronted with virtually identical facts, performed the same analysis and came to the same conclusion. See Contship, 442 F.3d at 78 ("Knowing Cal Hypo's tendency to lose thermal stability when heated, Contship stowed it in a superheated spot. Contship may not invoke strict liability where it brought about the very danger it knew to lie latent in its cargo."). Thus, a court undertaking this analysis must determine whether the carrier actually or constructively knew the cargo had a dangerous propensity and, if so, whether it nevertheless exposed the cargo to the conditions that activate such propensity. If the answer to both questions is yes, then the carrier may not invoke strict liability.

Here, pursuant to Contship and Harmony V, Defendants are entitled to summary judgment on Rickmers' strict-liability claim because Rickmers either actually or constructively knew that the SS-89 cargo had certain dangerous propensities and nevertheless exposed the cargo to the condition that activates those dangerous propensities. The parties do not seriously dispute the second prong of this analysis—that Rickmers exposed the SS-89 to the condition, water, that activates its alleged dangerous

propensities.[7]  Rickmers stowed the cargo below deck in a hold
that flooded upon the RICKMERS GENOA's collision with the SUN
CROSS.  Rickmers Genoa, 622 F. Supp. 2d at 62.  When the hold
flooded, the 600-ton cargo of SS-89 was exposed to a significant
amount of water.[8]  Id.  The SS-89 allegedly released hydrogen
sufficient to cause it to explode and catch fire four hours
later.[9]  See id.  The analysis, therefore, turns on whether
Rickmers had knowledge or constructive knowledge of the SS-89's
dangerous nature prior to the commencement of the voyage.  See
Harmony V, 533 F.3d at 93.  As explained below, Rickmers'
knowledge is fatal to its strict-liability claim.

     Rickmers' knowledge consisted of three components: the
information it received from Pudong Trans, the IMDG Code, and
the prior knowledge of the RICKMERS GENOA's master.  First,
Pudong Trans informed Rickmers that the cargo was "Magnesium and

---

[7] For the purposes of this Opinion, the Court assumes, but does
not find, that SS-89 constitutes an inherently dangerous good
under § 4(6).

[8] The applicable law does not appear to require that the carrier
have any particular mental state when exposing the cargo to
conditions that activate cargo's dangerous propensities.  Even
if a lack of negligence in exposing the SS-89 to water could
permit Rickmers to proceed with its strict-liability claim,
however, Rickmers' own expert takes the position that Rickmers
was at least partly to blame for the collision.  (See Dillon
Reply Aff., Ex. 8 at 10-11.)  Accordingly, such a finding would
not be warranted based on the record presently before the Court.

[9] The Court does not find these facts to be true but rather
assumes these facts to be true only for the purposes of this
motion.

articles thereof including waste and scrap: Raspings, turnings and granules, graded according to size; powders." (ESM 56.1 Stmt. ¶¶ 39, 48; Rickmers 56.1 Stmt. ¶¶ 39, 48.) It identified the cargo this way——in accordance with Rickmers' established booking procedures (ESM 56.1 Stmt. ¶ 47; Rickmers 56.1 Stmt. ¶ 47)——by providing Rickmers with the appropriate HTS Commodity Code number, 81043000 (ESM 56.1 Stmt. ¶ 48; Rickmers 56.1 Stmt. ¶ 48). Paul Wang of Rickmers' commercial booking staff in Tianjin received the 81043000 number and understood that it referred to a magnesium-based cargo. (ESM 56.1 Stmt. ¶¶ 27, 55; Rickmers 56.1 Stmt. ¶¶ 27, 55.) Wang, however, entered the number for the proposed cargo into the Softship System as 810419, the HTS Commodity Code number that identifies "Other unwrought magnesium." (ESM 56.1 Stmt. ¶ 52; Rickmers 56.1 Stmt. ¶ 52.) This description conveyed less information than the number Pudong Trans had provided to Rickmers. Wang then forwarded this new number via the Softship System to Joachim Neimke. (See Neimke Dep. 119-21 (implying that Neimke reviewed the information Wang supplied regarding the proposed SS-89 shipment).)

Neimke testified at his deposition that the HTS Commodity Code number constitutes information that could have helped him make booking and stowage decisions about cargo. (Neimke Dep. 102:5-18.) Although nothing at the time prevented Neimke from

using this information to make such decisions (Dillon Aff., Ex. 1 ¶ 61), Neimke nevertheless did not use this information to make decisions about booking or stowing the SS-89 before the Casualty (id. at 102:5-11).  Additionally, Neimke did start using HTS Commodity Code information for those purposes several months after the Casualty.[10]  (Neimke Dep. 102:14-18.)

The inescapable conclusion is that Pudong Trans' provision of the HTS Commodity Code number 81043000 informed Rickmers that the SS-89 had the characteristics of "Magnesium and articles thereof including waste and scrap: Raspings, turnings and granules, graded according to size; powders."  (ESM 56.1 Stmt. ¶ 39; Rickmers 56.1 Stmt. ¶ 39.)  That Neimke received a different, less specific number than the one Pudong Trans provided is the fault of Wang, one of Rickmers' own employees. Nothing in the record indicates that this discrepancy is chargeable to Pudong Trans or ESMT.  Thus, the Court finds, based on all of the above, that Pudong Trans informed Rickmers that the SS-89 had the properties of "Magnesium and articles thereof including waste and scrap: Raspings, turnings and granules, graded according to size; powders" and that Rickmers could have used that information to understand the dangerous

---

[10] The Court considers this fact not as evidence of liability—for which it is inadmissible, see Fed. R. Evid. 406—but only as evidence that such use is neither impossible nor commercially impracticable.

nature of the SS-89 before it accepted and stowed it.  The Court
also finds that Rickmers both ignored that information when Wang
failed to provide the proper HTS Commodity Code number to Neimke
and would have ignored that information when Neimke failed to
use the HTS Commodity Code number that Wang did provide to make
decisions regarding the booking and stowage of the SS-89.
Rickmers' admission that it could have used that information to
make such decisions (see Dillon Aff., Ex. 1 ¶ 61) is central to
this finding.  Under the applicable legal standard, Rickmers
avoided this knowledge at its peril.

Second, the IMDG Code shaped Rickmers' actual or
constructive knowledge of the nature of the SS-89.  Rickmers,
like all other carriers, was charged under applicable law with
knowledge of the information set forth in the IMDG Code at the
time it booked the SS-89 on the RICKMERS GENOA.  See Harmony V,
533 F.3d at 88 (noting that the Code "serves as an important
reference for carriers seeking to transport cargo safely and
efficiently while complying with international regulations"), 95
(attributing knowledge of the Code's warnings to the carrier
without addressing whether the carrier had actual knowledge of
the Code's provisions).  The IMDG Code includes "magnesium
powder or magnesium alloys powder" as dangerous substances.
(Dillon Aff., Ex. 19 at 1.)  It states:

> In contact with moisture, water or acids, evolves
> hydrogen, a flammable gas.  Magnesium dust is easily
> ignited, causing explosion.  May explode when in
> contact with oxidizing substances.  For fire-fighting
> purposes, dry lithium chloride powder, dry sodium
> chloride or graphite powder should be carried on board
> when this substance is transported.  Reacts with
> liquid halogenated hydrocarbons.

(Id.)  SS-89 itself, however, is not required to be listed in

the IMDG Code and is not so listed.  (See Rickmers Cmts. on

Proposed Analysis 6 ("ESM would have presumably provided such

disclosure in accordance with international law . . . or the

IMDG [C]ode, if SS-89 met the minimum requirements of the

IMDG[-]classified Magnesium Granules."); Dillon Aff., Ex. 1

¶ 7.)

     Pudong Trans' attestation that the cargo was "Magnesium and

articles thereof including waste and scrap: Raspings, turnings

and granules, graded according to size; powders" sufficed to

inform Rickmers that all the properties associated with those

kinds of materials should be attributed to the SS-89 as well.

These properties included the dangerous properties of magnesium

powder that were detailed in the IMDG Code.  (See Dillon Aff.,

Ex. 19 at 1.)  This information may or may not have been the

most specific, accurate description possible.  But, at a

minimum, the plain language provided by Pudong Trans should have

raised a red flag at the Rickmers cargo-booking desk: it

included magnesium powder, which is described in the IMDG Code

as being flammable or explosive when wet.  Although the
description included additional substances that may or may not
have been hazardous themselves, this fact alone does not allow
Rickmers to bury its head in the sand with respect to the
dangerous substance Pudong Trans expressly disclosed.

Third, even if the four kinds of magnesium articles
detailed in the HTS Commodity Code description did not provide
specific-enough information to allow Rickmers to determine which
of those articles the SS-89 was (assuming arguendo that it could
only be one kind of article), the RICKMERS GENOA's master had
prior actual knowledge of magnesium that obviated any need for
further specificity.  Captain Bielawski knew, prior to the
Casualty Voyage, that "magnesium, plus seawater, that means
hydrogen," implying that the size and shape of the magnesium
articles were irrelevant.  (Bielawski Dep. 378:9.)  Even if
Captain Bielawski did not have the benefit of the more specific
information that the SS-89 was "Magnesium and articles thereof
including waste and scrap: Raspings, turnings and granules,
graded according to size; powders," his knowledge of the dangers
of magnesium would have applied equally to the description Wang
forwarded to Neimke, "Other unwrought magnesium."  See Ente
Nazionale Per L'Energia Elettrica v. Baliwag Navigation, Inc.,
605 F. Supp. 355, 363-64 (E.D.Va. 1984), rev'd on other grounds,
774 F.2d 648 (4th Cir. 1985) (finding a shipper not liable under

20

§ 4(6) for damages caused by the heating of a coal cargo at sea where the shipper had disclosed prior to shipment that the cargo was coal and the ship's master "admitted that he was aware that coal might spontaneously combust"). Therefore, the Court concludes that Rickmers either actually or constructively knew the dangerous nature of SS-89, viz., that it was flammable or explosive when wet.

Rickmers advances several arguments in an attempt to avoid this conclusion. First, the central problem Rickmers identifies is that SS-89 is not a cargo that the IMDG Code deems dangerous, yet SS-89 may in fact be flammable or explosive under certain circumstances. This is not, however, a new problem: it is possible for a cargo to have dangerous characteristics without being listed in the IMDG Code. See Senator Linie, 291 F.3d at 150. In the most relevant case the Court of Appeals has considered, Senator Linie, a shipment of thiourea dioxide ("TDO") caught fire on board the carrier's ship during a voyage, causing damage. See id. at 149. At the time of the voyage, the IMDG Code did not classify TDO as dangerous cargo, id. at 150, and the shipper had provided no information about the TDO's dangerous characteristics other than a letter stating, "[o]ur merchandise are all regular chemicals, not hazardous," id. at 151. Under these circumstances, the Court of Appeals allowed the carrier to proceed on its strict-liability claim because the

21

carrier had no knowledge of the TDO's dangerous nature.  See id. at 152-53.

Rickmers, however, does not benefit from the Senator Linie analysis because the facts of this action are inapposite to those of Senator Linie.  Although the IMDG Code did not classify SS-89 as dangerous, Rickmers had other knowledge that indicated that the SS-89 had dangerous characteristics.  It knew from Pudong Trans' booking inquiry that the SS-89 was "Magnesium and articles thereof including waste and scrap: Raspings, turnings and granules, graded according to size; powders."  It knew from the IMDG Code that at least one of those four substances, magnesium powder, became flammable or explosive upon contact with water.  And the RICKMERS GENOA's master, Captain Bielawski, knew that "magnesium, plus seawater, that means hydrogen," implying that the size and shape of the magnesium articles were irrelevant.  (Bielawski Dep. 378:9.)  Therefore, Rickmers' first argument does not defeat a finding that Rickmers knew the SS-89's dangerous nature.

Additionally, although Rickmers insists—repeatedly—that the November 2004 letter of indemnity contained a representation that SS-89 posed no hazards whatsoever, the letter's plain text does not support this interpretation.  The letter states only that the SS-89 "is not dangerous cargo listed in <<International Maritime Dangerous Goods Code>>" and that the cargo had been

22

packed in a seaworthy manner.  (O'Connor Aff., Ex. 55 at 1.)  It does not state that SS-89 is unqualifiedly safe under all circumstances.  Thus, Rickmers' first argument does not raise a genuine issue of fact regarding Rickmers' knowledge.

Second, Rickmers proffers a container list and cargo manifest for a different voyage showing that its own agent in the People's Republic of China, a company called Penavico, distinguished magnesium powder from SS-89.  (See O'Connor Aff., Exs. 44-45.)  Rickmers contends that Penavico's distinction demonstrates that magnesium powder and SS-89 must be considered different kinds of substances for all purposes relevant here. Even if the Court were to credit the validity of Penavico's distinction—which the Court does not do at this juncture— Rickmers' argument would fail to show why Rickmers should not have attributed the properties of magnesium powder and like substances to the cargo of SS-89.  It would also fail to account for Captain Bielawski's prior knowledge that "magnesium, plus seawater, that means hydrogen," which did not distinguish particular sizes or shapes of magnesium articles.  (Bielawski Dep. 378:9.)  Therefore, Rickmers' argument based on Penavico's distinctions does not raise a genuine issue of fact as to Rickmers' knowledge.

Third, Rickmers contends that SS-89 is actually granules of coated magnesium and so Rickmers could not have attributed the

23

properties of magnesium powder to the SS-89.  (See Rickmers
Cmts. on Proposed Analysis 5.)  This argument is invalid because
the actual physicochemical properties of SS-89 are not precisely
at issue: the issue, rather, is Rickmers' knowledge about the
SS-89 at the time it booked the cargo.  Because the record
contains no evidence that Rickmers' agents or employees had ever
opened and inspected SS-89 cargo prior to Neimke's booking the
SS-89 for shipment on the Casualty Voyage, Rickmers' knowledge
can be derived only from Pudong Trans' attestations and the IMDG
Code.  Therefore, Rickmers' argument based on the actual makeup
of SS-89 fails to raise a genuine issue of fact as to Rickmers'
knowledge.

Finally, although Rickmers contends that only a MSDS could
have provided a legally or commercially adequate warning of the
SS-89's dangerous nature, it cites no authority supporting its
contention.  Therefore, Rickmers has failed to raise a genuine
issue of fact as to whether Rickmers knew the dangerous nature
of SS-89 when it booked and stowed the cargo for the Casualty
Voyage, and Defendants are entitled to judgment on Rickmers'
§ 4(6) claim as a matter of law.  Accordingly, Defendants'
motion with respect to Rickmers' strict-liability claim is
granted.

2.   <u>Negligent Failure to Warn</u>

COGSA also governs Rickmers' negligence claims.  COGSA

provides: "The shipper shall not be responsible for loss or

damages sustained by the carrier or the ship arising or

resulting from any cause without the act, fault, or neglect of

the shipper, his agents, or his servants."  § 30701 note § 4(3).

"A shipper's negligent failure to warn the carrier about dangers

inherent in a cargo constitutes such 'fault' or neglect and

gives rise to a cause of action for negligent failure to warn."

<u>Harmony V</u>, 533 F.3d at 94 (citing <u>Contship</u>, 442 F.3d at 78).

> To prevail on a claim of negligent failure to warn,
> [Rickmers] must demonstrate "(1) that [ESM] failed to
> warn [Rickmers] about dangers inherent in the [SS-89]
> of which the stevedore and ship's master could not
> reasonably have been expected to be aware; and (2)
> that an absent warning, if given, would have impacted
> stowage."

<u>Id.</u> (quoting <u>Contship</u>, 442 F.3d at 78 (internal quotation marks

omitted)).

With respect to the presence or absence of a duty to warn,

the <u>Harmony V</u> court contrasted the "binary" inquiry applicable

to strict-liability claims with a "fact-sensitive, 'calibrated'

analysis" applicable to negligence claims.  <u>Id.</u> at 95.  This

"reasonable awareness inquiry asks whether it would have been

reasonable to expect the carrier to know of the <u>specific type</u>

<u>and degree of danger</u> posed by the cargo at issue."  <u>Id.</u> at 95.

The shipper has a duty to warn the carrier of any specific

dangers of which the carrier could not reasonably have known.
Id.

In Harmony V, as discussed supra, the carrier's knowledge
of the specific type and degree of danger presented by the
calhypo was derived from both the IMDG Code and the information
provided by the shipper. Id. at 95. The IMDG Code warned
carriers to avoid exposing calhypo to heat sources greater than
55°C for periods of more than twenty-four hours. Id. The
shipper warned the carrier that calhypo was unstable above
117°C. Id. Yet these warnings were insufficient to notify the
carrier of all the dangers the calhypo presented in the manner
in which it was packaged for that voyage, id. at 96: that
particular shipment of calhypo was packaged in such a way that
it had to be kept below 41°C rather than 55°C in order to remain
stable, id. at 95-96. Because the calhypo's maximum safe
temperature was lower than any information available to the
carrier indicated, the shipper had a duty to warn the carrier
about the undocumented fourteen-degree temperature differential.
Id.

Here, by contrast, ESMT had no duty to warn Rickmers of any
specific dangers because the SS-89 presented no dangers of which
Rickmers could not reasonably have been aware. Pudong Trans
informed Rickmers that the SS-89 was "Magnesium and articles
thereof including waste and scrap: Raspings, turnings and

26

granules, graded according to size; powders." (ESM 56.1 Stmt.
¶ 39; Rickmers 56.1 Stmt. ¶ 39.) The IMDG Code stated that at
least one of those materials, magnesium powder, was flammable or
explosive, particularly when wet. (Dillon Aff., Ex. 19 at 1.)
Rickmers admits that it could have used that information to make
decisions regarding booking and stowage. (Id., Ex. 1 ¶ 61.)
And, perhaps most importantly, Captain Bielawski already knew
that "magnesium, plus seawater, that means hydrogen."
(Bielawski Dep. 378:7-9.) Thus, unlike in Harmony V, there were
no undisclosed hazards present here that required a warning from
Pudong Trans or ESMT, and so neither Pudong Trans nor ESMT had a
duty to issue an additional warning. Accordingly, Defendants'
motion with respect to Rickmers' negligence claim is granted.


### 3.   Breach of Contract

Rickmers alleges that Defendants breached both a bill of
lading issued by Rickmers to Pudong Trans and a bill of lading
issued by Pudong Trans to ESMT. This claim, however, must also
be dismissed. First, ESMT is not bound by the Rickmers-Pudong
bill of lading except with respect to provisions not at issue
here. The document itself indicates that Pudong Trans was the
shipper and Rickmers was the carrier. (O'Connor Aff., Ex. 58 at
1.) Nowhere does it mention ESMT. (See id.) Thus, ESMT was
not a party to the Rickmers-Pudong bill of lading unless Pudong

Trans was acting as the agent of ESMT in forming the contract with Rickmers.

The Supreme Court of the United States has addressed precisely this question: whether intermediaries like Pudong Trans constitute agents of shippers for purposes of contract liability under federal maritime law.  Examining whether a shipper was bound by the provisions of a bill of lading entered into by the shipper's intermediary, the Court held "that intermediaries, entrusted with goods, are 'agents' only in their ability to contract for liability limitations with carriers downstream."  Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 34 (2004).  The Court then characterized this holding as implementing "a limited agency rule."  Id. (emphasis added).  Subsequently, at least one court in the Southern District of New York has interpreted Kirby according to its plain language, see Fed. Ins. Co. v. M/V CMA CGM Marlin, No. 09 Civ. 1409(GBD), 2010 WL 727217, at *2 (S.D.N.Y. Feb. 23, 2010), and the courts that have distinguished Kirby's plain language have also distinguished its facts, see, e.g., Coutinho & Ferrostaal, Inc. v. M/V Spar Taurus, No. 09 Civ. 9672(BSJ), 2010 WL 3238938, at *2 (S.D.N.Y. Aug. 16, 2010) (reasoning that Kirby was inapposite where the party allegedly bound by a bill of lading actually signed the document and was named on it).

This Court finds no reason to extend the rule articulated in Kirby.  Further, Rickmers presents no evidence of "the traditional indicia of agency," Kirby, 543 U.S. at 34, i.e., that Pudong Trans owed ESMT a fiduciary duty or that ESMT had any control over the actions of Pudong Trans.  Therefore, ESMT cannot be held liable for breach of the Rickmers-Pudong bill of lading.

Second, with respect to the Pudong-ESMT bill of lading, Rickmers has no standing to enforce the document's provisions. Rickmers does not contend that it was a party to this bill of lading, and indeed it was not.  (See O'Connor Aff., Ex. 57 at 1 (showing that the document identified Pudong Trans as the carrier and ESMT as the shipper).)  Instead, Rickmers asserts that it was an intended third-party beneficiary of the Pudong-ESMT bill of lading.  (See Rickmers Mem. Opp'n 31.)  It cites no authority or admissible evidence supporting its self-serving, conclusory assertion that "the Pudong bill of lading's provisions relating to the safety of the contemplated Super Sul MG 89 cargo were obviously intended to benefit the carrying vessel . . . ."  (Id. (emphasis added).)  This failure alone would warrant granting Defendants' motion on this issue.

In addition, no evidence indicates that the Pudong-ESMT bill of lading was written for the purpose of conferring a benefit upon Rickmers.  This lack of evidence precludes a

finding that Rickmers was an intended third-party beneficiary of the bill of lading.  See Restatement (Second) of Contracts § 302(1)(b) (1981) ("[A] beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.").  Thus, Rickmers does not have standing to enforce ESMT's duty to comply with the terms of the Pudong-ESMT bill of lading.  See id. § 304 ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty."); § 302 cmt. e ("Performance of a contract will often benefit a third person.  But unless the third person is an intended beneficiary as here defined, no duty to him is created."); cf. id. § 315 ("An incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.").

     After the parties had fully briefed this motion and after the Court had asked for comment on a proposed version of this Opinion's analysis, Rickmers raised—for the first time—an argument that the Pudong-ESMT bill of lading expressly refers to Rickmers as an intended third-party beneficiary.  The Court rejects this argument as abandoned because Rickmers failed to

30

raise it in its opposition to Defendants' motion, but the argument is meritless in any event.  Rickmers contends that the Pudong-ESMT bill of lading indemnifies Rickmers because it "identifies the carrying vessel as the 'RICKMERS GENOA' and provides the 'Carrier' with a dangerous goods indemnity." (Rickmers Cmts. on Proposed Analysis 9.)  The document does not support this interpretation, however, because it expressly identifies Pudong Trans as the "Carrier."  (See O'Connor Aff., Ex. 57 at 2 ("'Carrier' means the issuer of this Bill of Lading as named on the face of it.")  Accordingly, Defendants' motion with respect to Rickmers' breach-of-contract claim is granted.

### 4.   Detrimental Reliance

Finally, Rickmers asserts a claim of detrimental reliance on the February 22, 2005 letter of indemnity allegedly drafted by ESMT.  (See O'Connor Aff., Ex. 56 at RG12020.)  The Court notes the parties' dispute over the validity of the document: whereas Rickmers assumes that the document is legitimate, ESMT points out aspects of the document that suggest it may in fact be a forgery.  This dispute, however, is immaterial in light of the following undisputed facts.  Neimke testified that he did not rely on this letter of indemnity when he made decisions regarding acceptance and stowage of the SS-89 shipment.  (Neimke Dep. 107:16-108:6.)  Although he did testify that he relied on a

letter of indemnity issued in connection with a prior voyage (id. at 108:7-14, 111:21-24), that letter by its terms provides indemnity only for voyage 146 of the Rickmers New Orleans (see O'Connor Aff., Ex. 55 at 1). Nothing on that document indicates that its coverage should extend to the Casualty Voyage (see id.), and Rickmers cites no authority supporting its alternative contention that such indemnity should nevertheless cover the Casualty Voyage. Therefore, the Court concludes that Rickmers did not detrimentally rely on either of these letters of indemnity when it accepted the SS-89 on the Casualty Voyage.[11] Accordingly, Defendants' motion with respect to Rickmers' claims based on detrimental reliance on a letter of indemnity is granted.[12]

### 5. Claims Asserted by the Cargo Interests

The Cargo Interests have asserted claims against Defendants, and Defendants move for summary judgment on those

---

[11] The Court's findings with respect to Rickmers' claims based on the letters of indemnity are also fatal to Rickmers' claim based on Defendants' purported breach of warranty or negligent misrepresentation. (See Rickmers Cmts. on Proposed Analysis 10 (articulating after briefing had ended, and for the first time, an argument that these claims should survive Defendants' motion).)

[12] Rickmers' remaining causes of action, which seek to hold ESM Group accountable for ESMT's actions, are also dismissed because the Court has granted summary judgment on all of the claims against ESMT.

claims as well.  [See dkt. no. 152 (4261 action) at 2.]  These
parties' threshold dispute is whether COGSA governs claims by
cargo interests in addition to carriers.  If it does, then all
of the findings herein apply equally to the Cargo Interests'
claims here, warranting the grant of summary judgment on those
claims as well.  As discussed below, the Court finds that COGSA
applies to claims by cargo interests, and so Defendants are
entitled to summary judgment on the Cargo Interests' claims in
these actions.

With respect to the Cargo Interests' strict-liability
claims, § 4(6) states that "the shipper of such goods shall be
liable for all damages and expenses directly or indirectly
arising out of or resulting from such shipment."  (Emphases
added.)  The plain text of this section does not limit any
interested party's right to bring COGSA-governed tort claims
against shippers.  Rather, it expressly extends shippers'
potential liability to "all" damages "directly or indirectly"
caused by the shipper's undisclosed, dangerous goods.
§ 4(6).  The plain text of this section, therefore, supports the
view that § 4(6) governs claims by cargo interests against
shippers, and the only other court in the Southern District of
New York to consider the issue has found exactly that.  See
Harmony I, 394 F. Supp. 2d at 672 ("Congress did not limit
liability under the section to any particular class of entities,

nor did Congress impose a requirement of privity. . . . It is the vessel and cargo owners whose property is damaged or destroyed who require protection.").

With respect to the Cargo Interests' negligence claims, however, § 4(3) states that "[t]he shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants." (Emphasis added.)  The text of this section differs from that of § 4(6) in that it limits the rights of certain parties— specifically, carriers—to sue shippers.  Yet it does not mention other kinds of parties, such as cargo interests.  This presents a "Scylla and Charybdis"-type problem of statutory interpretation.  On the one hand, subsection 3 implicitly constructs a framework for analyzing negligence claims against shippers by carriers but does not do so for negligence claims by cargo interests, and the Court is loath to create rights under § 4(3) beyond what Congress intended.  On the other hand, subsection 3 does not expressly "limit liability . . . to any particular class of entities [or] impose a requirement of privity," Harmony I, 394 F. Supp. 2d at 672, and the Court is unpersuaded that Congress would have limited the rights of cargo interests—they being natural victims of maritime negligence— without doing so expressly.  Therefore, the Court concludes that

34

the plain text of § 4(3) is ambiguous as to whether it applies to cargo interests' claims.  To resolve this ambiguity, the Court looks to the structure of § 4, to COGSA's purpose, and to the way the Court of Appeals appears to have interpreted § 4(3).

Section 4 contains six subsections that, according to the section's title, set forth the "[r]ights and immunities of [the] carrier and [the] ship."  Were the Court to determine which subsections created "rights" of the carrier and which created "immunities," however, it would be an exercise in futility because § 4(3) does neither.  Assuming that the text of §§ 4(1)-(2) and (4)-6) creates "immunities" of the carrier, Congress' use of the same syntax in § 4(3) must be understood to create an "immunity" of the shipper: it renders the shipper immune from responsibility for damage to the vessel where the shipper did not act negligently.  This is neither a "right" nor an "immunity" of the carrier or the vessel, notwithstanding Congress' placement of the provision in a section containing that title.  Therefore, the Court concludes that the title of § 4 does not meaningfully indicate that cargo interests may not bring negligence claims against shippers.

In addition, no other subsection of § 4 "limit[s] liability . . . to any particular class of entities [or] impose[s] a requirement of privity."  Harmony I, 394 F. Supp. 2d at 672.  Indeed, every other subsection appears to contemplate claims by

35

cargo interests.  First, all of those subsections refer generally to "loss or damage" without referring expressly to the party or parties who may be harmed.  Second, cargo interests, in addition to carriers, are the natural parties to suffer the kinds of loss or damages described in those subsections. Bearing this context in mind, it is difficult, if not impossible, to read § 4 as extending COGSA's scope to all potential claims regarding the carriage of goods by sea other than cargo interests' negligence claims against shippers. Therefore, a structural analysis of § 4 supports the view that § 4(3) does not limit shippers' negligence liability under COGSA to claims by carriers.

COGSA's purpose supports the same view.  As the Court of Appeals has explained, "COGSA's overarching purpose [is] to 'allocate risk of loss and create predictable liability rules on which not only carriers but others can rely.'"  Senator Linie, 291 F.3d at 169 (emphasis added) (quoting Stolt Tank Containers v. Evergreen Marine Corp., 962 F.2d 276, 279 (2d Cir. 1992)).  A holding that § 4(3) governs cargo interests' negligence claims against shippers would clarify the circumstances under which shippers could be subject to negligence liability and would make the consequences of parties' decisions more predictable.  Thus, COGSA's purpose supports the view that cargo interests may pursue negligence claims against shippers under § 4(3).

Finally, and of no small importance, it appears that the Court of Appeals has implicitly permitted cargo interests to bring negligence claims against shippers pursuant to § 4(3).  In Harmony I, both the carrier and the cargo interests were proceeding on strict-liability and negligence claims against the calhypo shipper.  See 394 F. Supp. 2d at 672-73.  The District Court held the shipper liable on all such claims, both under COGSA and under the general maritime law of negligence.  See id. (citing both COGSA and general maritime law).  On appeal, in the relevant part of Harmony V, the Court of Appeals identified § 4(3) as the governing legal standard and then vacated the District Court's negligence determination so that the District Court could issue additional findings of fact on the issue of causation.  See 533 F.3d at 94, 97.  Notably, the Court of Appeals did not reverse the District Court's judgment on the question of whether cargo interests could bring negligence claims against shippers under § 4(3).  See id. at 97.  The most reasonable inference from this is that § 4(3) governs cargo interests' negligence claims against shippers.

For these reasons, the Court concludes that the Cargo Interests' negligence claims against Defendants here are governed by § 4(3).  Pursuant to the same analysis detailed above regarding Rickmers' failure-to-warn claim, Defendants are entitled to summary judgment on the Cargo Interests' negligence

37

claims.[13]  Accordingly, Defendants' motion with respect to those claims is granted.


IV.  CONCLUSION

For the foregoing reasons, Defendants' motion [dkt. no. 152 (4261 action)] is GRANTED.  The remaining parties shall confer and inform the Court by Monday, November 15 how they propose to proceed.


SO ORDERED:

DATED:    New York, New York
          November 4, 2010


_Loretta A. Preska_
LORETTA A. PRESKA, Chief U.S.D.J.

---

[13] Both the Cargo Interests and Rickmers assert causes of action that nominally invoke negligence.  Substantively, however, these causes of action merely restate already-asserted failure-to-warn and strict-liability claims.  Accordingly, the Court construes the "negligence" claims as mere restatements of those two causes of action, which the Court has addressed supra.